Number 22-12-23 Philips North America, LLC v. Fitbit, LLC Okay, Mr. Thompson Good morning, your honors, and may it please the court The board erred in three respects in this case. Two on legal grounds that are reviewed de novo, and one involving the failure of the board to explain the reasoning of motivation, which is twofold. In the first instance, as far as the explanation, it's de novo, but then diving into the evidence, it's substantial evidence. Let's talk about the first error, which involves a claim construction, claim interpretation. The board erred as a matter of law in failing to give substantial effect to the language in claim one that required governing of information transmitted between a first personal device and a second personal device. The board recognized that there was a dispute between the parties on that term, but in the end, the board failed to give it any meaning beyond security mechanism and thereby improperly read it out of the claim. Focusing on the claim language itself and following the Philips analysis, claims, different terms are presumed to have different meanings, and that was something that actually was observed by this court in the Hamilton Beach case. Does the specification use the word governing? If I were to read the entire patent, would I see some form of the word govern? The governing was in the claims, that's fine. In the written description. In the specification, the word governing is not there, but the meaning of governing is explained at length. Okay, so it shows up for the first time in claim one. Yes, well, it was there at the beginning. The word govern. Yeah, yeah. Okay. But the concepts are there throughout, and indeed, in looking at different terms presumptively having different meanings, the claim itself talks about security mechanism, uses the word security in the front, and then contrasts that to governing in the back. The spec talks about passwords and encrypting data transmissions, right? It talks about that as a tool. Yes, it does. And it gives examples of what the governing would be. For example, the specification talks about how a bystander would only receive authorized voice communications from the dispatcher and provide camera information to him. That's an exclusive meaning of governing. I mean, I don't see anything in the specification to say that that's the exclusive meaning of governing. In fact, you have dependent claims here which talk about encryption as a form of governing. They talk about, I think, encryption in keys. If you look at the claims, they're talking about that being a tool that can be used. But why don't the dependent claims make pretty clear that governing includes encryption? But not encryption just if encryption exists, then that must be governing. I don't think that's what the fair reading of the specification is. I don't think that's how the dependent claims relate to independent claims. If I understand the differentiation law of this court, what you say is that the independent claims do not have the dependent claims read into them. And I think that to say that because encryption is mentioned in a dependent claim, for that matter, keys and other things are mentioned as tools would mean that that's what the security mechanism is. But it's not what the security mechanism is, but it has to be a security mechanism that's within the scope of Claim 1. If the security mechanism does the things that are provided in the claim, that's what I'm saying. The encryption of keys can be a tool, but they are not the thing. The security mechanism has to govern it, and to govern the information that's transmitted. And the examples throughout the specification are there, for each person, by the way. In this particular patent, there's a victim, there's a bystander, there's a first responder, and then there's a dispatcher. And each one of them, when you look at the specification... The problem I have with this claim, which is breathtakingly broad, is that it doesn't at all capture that scenario that you just referred to that's described in the written description about a victim, about a bystander, about some other third party, and then a dispatcher. All we're looking at here in Claim 1 is a first personal device and a second personal device talking to each other, and a security mechanism that governs information transmitted between those single two devices. So this could be any scenario when you have two devices. That's it. There's nothing about victim, bystander, dispatcher, et cetera. It talks... I would suggest that it's not as breathtakingly broad, perhaps, as Your Honor may see at first blush. What I would say is... I've seen a lot of claims. This one is pretty broad. There's not a lot of words. Your Honor, but the meaning is there. So the claim says that a communication channel is established. So that has to be in existence. And the patent talks about how a network... I don't think it says a communication is established. Well, I think that it says in the element above, it says the second device communicating with the first device. Right, but this is a product claim, right? This is not a method claim. That's true. And you certainly wouldn't assert that this is some hybrid claim of a product claim with process steps inside of the product claim, right? Right. So this is just a product claim. That's right. So maybe the better way to read the phrase you just read is a second device capable of communicating with the first device. And my point is that in reading then the element C, a security mechanism having security contrasted to governing and looking at the specification. Of course, the court has ruled, going back to Phillips, that the patents are an integrated instrument and the specification is the best way to understand what the meaning is when you explain the invention in this way. And it's very clear from the specification that governing is talking about regulating the level of access to certain types of transmitted information. That's what it's talking about. It's regulating the amount of certain types of information between the devices. And it's very clear in the patent that that's a limitation. And that's what the prior art did not show. In fact, the prior art that was referenced by the petitioner here had only two things. One was a password that would disable a device so it wouldn't even communicate. Where's the language in the specification that says it's limited to having different levels of communication, particularly since governing doesn't even appear? Well, I think that you can start right with the abstract. You can start on the front page of the patent where it says that the system provides multiple levels of prioritization. That's on the face of the patent. And then you go into the specification and you see that the system that is described, that is the substance of this, isn't about like we came up with a system that would have encryption between devices. That concept really isn't in there. The concept that's explained at length is this governing concept where you use the security mechanism as a means to govern the amount of information between the devices that have the established communication. And so I think not only does the abstract refer to that, but then so does a number of instances, which I'm happy to reference, which is Appendix 65, 12, 30 through 35, relates to the bystander providing voice communications and camera. This patent has 57 claims. Do any of them talk expressly about providing multiple levels of access to information being transmitted? That's an independent claim. Okay, let's assume for the moment it's not there in claim one. My question was really more about expressly. Is there any claim that really gets that granular and talks about multiple levels of access, multiple levels of prioritization, et cetera? No, I think that the specification in explaining the governing, what is in the I'll just take it that the other 56 claims don't give me any more actual detail about this concept that you're getting at. You're using the word governing in claim one as a stand-in for all of these more detailed ideas. I was just trying to figure out if by any chance other claims actually provided that detail. But if they don't, that's okay. Keep going. I will say that parsing out the governing I don't believe is in the dependent claims. The ones that were referenced before about tools, but the governing is in the independent claim and in the specification. As I explained, treating it as an integrated instrument. Again, the application here is that they did not find that. That's not in the art. The prior art that the petitioner went searching for and found, the best thing they could find was typing in a password that would disable a device. But once it was enabled, all of the information was transmitted. There was no governing of it at all. It was all the information, no certain types available, and that's the Jacobson device. The second device was the Say device, and that had a sensor unit, like a sensor on your skin at the hospital, maybe measuring your vitals, and a display unit. In that instance, while that communication was encrypted, perhaps for identification as well, when the connection was made, it was a forward connection. There was no information that was governed whatsoever in that connection. The two items of art that they relied upon don't have governing in them. Only if you take governing and treat it as equivalent to security and encryption do you get to the point where you can find that. A second issue that I'd like to raise relates to the board's error in ruling that the motivation on motivation for saying Gabi. This is the third point that was raised in our brief. In this particular instance, the board summarized what the parties had said and then just credited the petitioner. It didn't explain motivation. Of course, this court has recognized that for hindsight bias, requiring the board to explain motivation is the guard against that, and that that's the safety net to make sure that we don't let hindsight go into all of our cases. In this particular instance, if you look through it, all the board found was that Gabi was pertinent art, I think is the term that they used. They did not go to explain why one would... What if we conclude what the board actually did there, in effect, was adopting the petitioner's rationale that it summarized in the opinion? If you were to go past, that would go past the did they actually explain the motivation. You just say, well, they did sufficiently. Then I think the question becomes substantial evidence. In this particular instance, there's no substantial evidence for motivation. There were only two things that were identified by the petitioners to show motivation, and they both came from the same reference. The first was that in the connection between the sensor unit and the display, so the sensor unit and display, the display could be small and have a pager effect. Well, that's not a new connection. Remember that for this particular claim, the claim requires that there be yet another device, another central device that the sensor would connect to. In the Say reference, there's absolutely no motivation. They identified none. Why? Just because the display might connect to something else. That would mean that you would add something to the sensor unit. In fact, it would be contrary to what Say describes, which is primarily the connection between the sensor unit and the display. That was the first thing that they highlighted. The argument you just made right there, did you make that in your blue brief? I saw it in your yellow brief. I don't remember seeing it in the blue brief. Yes, that has been in our briefs going back to the patent owner's response, Your Honor, and I believe that was throughout. I can certainly give you a citation in the patent owner's response. That argument may be found in appendix, let's see, patent owner response 2022 and 2106 are some examples of that. I'd say then the second point that they raise is they say that there can be a repeater unit. This was the doctor's office reference in their brief. In a repeater unit, you take the sensor, like you're in a hospital room, and then you repeat the sensor unit to the display. But it's that connection. It's the connection between the sensor unit and the display. Remember that the claim requires yet a different connection to the Internet from the sensor. They use that for motivation, but that doesn't show motivation at all. My point is that's no evidence of motivation, and they certainly did not explain it. In addition, I'll say that in the Goodbye reference, what that reference is is a toy where the Internet connection downloads the voice files and some other files, content files. It calls it a content dispatcher. That certainly would have no use in the Say device where this is a sensor unit. It has no use for information like that. And so I would like to make one brief comment. I am a little bit over. I'll use one of my minutes from the following if it's okay. There's no following. Okay. Then I will stop. We'll give you two minutes for a vote. Okay, thank you. Mr. Zylberger. May it please the Court, I'll begin with the security mechanism limitation. Jacobson and Say each teach systems that govern information transmittal between the first and second device, and the intrinsic record rejects the notion that a password that regulates whether communication will occur, like in Jacobson, or encryption that's applied to information actually transmitted, like in Say, should be carved out of the meaning of the security mechanism. First, the claim is written broadly. It covers any security mechanism that's capable of governing information transmitted between the first and second device. As Your Honor's pointed out, the word govern does not appear anywhere in the specification, but what the specification does do is provide numerous examples of such a security mechanism. We see that, for example, at Appendix 63 in Column 8, where the patent specifically talks about a user entering a password to gain access to a device. And at Appendix 66, Column 13, we see several, in fact, non-limiting examples. The patent said that they're non-limiting examples, and it provides, as the first example, data transmitted to and from the personal device being encrypted. That's at Column 13, Lines 43 to 46. And as the fourth example, how a user of the personal device 100 may have a security key that he can enter to release information. That's at Line 52. Now, Phillips relies primarily on Figure 5 and how, in that scenario, you have a user, for example, a patient, a bystander who's an intermediary, and a third device who's like a medic. And in that example, it's a situation where the bystander, you might not want the bystander to have access to the information. You might want the medic to have access to information. And so in that particular example, there might be a need for different levels of access to the information. But there's at least two big problems with Phillips's reliance on Figure 5. For one, the claim does not recite that example. It doesn't even recite a third device. It recites two devices, and it only requires two devices. And, in fact, in Phillips's yellow brief at page 28, it conceives that the claim is not limited to this specific example. Moreover, with respect to the multiple levels of access, Phillips's expert, Dr. Martin, conceded at deposition that if you had a different scenario where you didn't necessarily care whether the bystander had access to the information, you would not need to have different levels of access. It's okay if everyone has the same level of access, and that would still be covered by the claim. That testimony is available at Appendix 1164 and 1165. Now, note, by the way, that the example that Dr. Martin referred to there was a scenario where a victim is being located, much like in Jacobson, where soldiers are being located. I'll conclude on this issue by pointing out that the security mechanisms in Jacobson and Say in particular are specifically tied to the communication itself, which is what gives breadth to the governing information transmitted between the first and second device aspects of the security mechanism. In Jacobson, the password is explicitly disclosed as being used to protect soldier locations that are being transmitted in this system. And in Say, encryption is specifically used to limit the use of medical sensor information that devices receive to only those devices that have the key to access that information. With respect to the combination of Say and Goodbye, Phillips is simply wrong that the board did not provide articulated reasoning to combine Say and Goodbye. In its final written decision, the board specifically referenced Dr. Paradiso's testimony at paragraphs 120 to 122, where Dr. Paradiso made, I think, three key points. For one, Say itself teaches that there are situations where it's preferable to boost the signal coming from the unit. The example it gives in Say, and that Dr. Paradiso discusses, is a scenario where a doctor's office or nurse's station wants access to that information, and so you want to extend the distance that it travels. In addition, Dr. Paradiso explained how Say and Goodbye describe very similar systems from a structural perspective, where they both have sensors, they both have information transmittal. There's no dispute on our end that Say and Goodbye have very different commercial purposes. Say is a medical device, Goodbye is a toy. That's an argument Phillips raised below, that Goodbye is a non-analogous reference. The board rejected that argument, and Phillips does not challenge that finding on appeal, despite its many references to Goodbye being a toy. Goodbye is an analogous reference, and that's not been challenged on appeal. I don't believe Phillips addressed its argument regarding grounds four to six, so unless the panel has any questions on that, I'll move on to our cross-appeal, which is where the only error that the board's decision contains lies. I don't really understand your position with respect to plan 14. You seem to be saying that a wireless port is the same as a USB port, and that doesn't make any sense to me. If you have wireless communication, you're not doing that through a USB port. Obviously, this is a questionable claim, but again, we have a situation where instead of arguing that someone skilled in the art would know that it was easy to connect two communication devices using wires through USB ports, you've made some convoluted argument, which is difficult with respect to that. Why are we in this situation? There's got to be plenty of prior art that shows communication between wireless devices using wires and USB ports. Yes, Your Honor. I think we absolutely could have submitted an obvious miscombination to address the claim. It would have been trivial to do so, but the key here is that the claim doesn't recite that it's limited to a USB or similar type of data input-output port. Why would you use the same kind of port for wireless communication and wired communication? That seems to me to be counterintuitive. I understand your question now, Your Honor. The point is that we're not arguing that the wireless device itself has some sort of physical connection. Our argument below was that the data input-output port is actually contained within the wireless module itself, that the wireless transmission, the output of the wireless transmission is the output port, and when it receives data, that's the input port. And I would note, at Appendix 30, the Board doesn't dispute that our prior art references have data input-output ports. No, don't go that far. At Appendix 30, Your Honor, what the Board held, I'm not saying the Board found it as a matter of fact, but they didn't dispute it. They said at Appendix 30, Petitioner does not point to anything in Jacobson that discloses a data input-output port that is separate from the BodyLAN168. And the final decision recognizes earlier that BodyLAN168 is the wireless communication module. The Board acknowledged that wireless communication modules have inputs and outputs, but it did not say that wireless communication modules have data input-output ports. And so that is the problem you have here with respect to the reference that you're relying on that has a wireless communication module. Why would anyone say that a wireless communication module has a data port? Wireless communication modules have transmitters and they have receivers. Why is a transmitter the data output port? Why is a receiver the data input port? I don't think your expert ever tried to make that explanation. And so that's the gap that we have here. Yes, Your Honor. What I would say is that in terms of the Board's fact findings, the only reason why the Board made the findings that Your Honor is referring to is because of its belief that Claim 14 would be rendered superfluous under our interpretation of the claim. And its explanation was that, well, if a wireless communication module already has a data input-output port, Claim 14 doesn't say anything that Claim 1 does not say. But that doesn't quite work because Claim 1, illustrating another example of its breadth, it never says that it's the wireless communication module that's used for the communication. It says that there's a first and second device that are... Do wireless communication modules necessarily possess data input-output ports? That's not an issue that was necessarily below, Your Honor. We explained how Jacobson and Say in particular have data input-output ports. And the only basis... They wouldn't be USB ports or something that would accommodate a wired connection, right? If it's just different. I mean, even if they have some sort of port, it wouldn't be a port that accommodates a wired connection. A wireless device would not have a wired connection, Your Honor. We're not suggesting that it does. Our position below and on appeal is that the wireless connection itself is a data input-output port. And, again, the only basis, as a matter of fact, that the board gave to reject that interpretation was its view that Claim 1 would be rendered superfluous. And that's just not correct as a matter of claim interpretation. I think it's a little bit more than that. It's the entire specification, including the figures, which illustrate how the data input-output ports is a separate thing from the wireless module. So I think that's also a very strong problem here. That militates against your view that we can just sort of slap the data input-output port into the wireless communication module. So it's beyond just the dependent claims, which actually expressly talk about further adding a data input-output port. So, structurally, that goes against you. But it's the specification itself, both the way it separately discusses these two items and then the way it separately illustrates these two items in the figures. So my one response to that, Your Honor, would be that the board did acknowledge at Appendix 20 that the specification does not provide any examples that would be harmonious or at least consistent with, on all fours, its interpretation of Claim 14. It said that even though the specific connections of components required by Claim 14 are not explicitly illustrated. And the specification certainly does have examples where you have different boxes of wireless modules and data input-output ports. But I would posit that, at best, that provides support for scenarios where you have them separately, but that doesn't require, as a matter of claim interpretation, them to be separate components. Is Claim 14 being asserted against you in a parallel district court proceeding? It was originally asserted, Your Honor, in the parallel litigation. Phillips has since dropped the claim. If there's no further questions, I'm happy to rest for now. Okay. Thank you. Mr. Thompson, you have two minutes. Is this patent now expired? Filing dates 2002. I think yes. Okay. Is Claim 14 being currently asserted in any of your parallel proceedings? No. Okay. I wanted to comment a little bit. I think that the argument about the say-goodbye obviousness as to Claim 15... Wait. Excuse me. Yeah. As to Claim 15, I think they're missing a point. And that's because they're not looking at the claim itself. Claim 15 is not Claim 1. Claim 15 depends from Claim 1, but it says that it further comprises, a pretty common language for adding an additional element, further comprising a central communications base station communicating with the first personal device. So Claim 1 is about a first personal device with a second personal device. This adds a new connection. The example that counsel gave, Your Honors, was an extension of the sensor unit to the display. That is clearly nothing like Claim 15, which is a new communication, a separate channel which goes to what I was talking about. Now, as far as motivation to make a modification like that to get to Claim 15, I think that the board's opinion on page 44, which is Appendix 44, really shows how much explanation they gave. I'll just read it. Like Grounds 4 through 6, we are persuaded that the petitioner has articulated sufficient reasoning with rational underpinnings to support the relevance of saying goodbye. That's it. There's no explanation, and I think it's supposed to be under court precedent, thorough and searching. That's the thorough and searching. I think that that's insubstantial, and I think there's a reason for it, which is that there is no basis behind that. And then I'm happy to make just one sort of comment about the input-output device. That, again, is another further comprising claim, and you all are absolutely correct. The Figure 2 shows how those are different, and then the specification at Column 3 makes it absolutely clear that we're talking about a data input-output port, which is a serial parallel or USB port, and the wireless communication module is infrared or radio frequency. You may find that at Column 4 at Line 46. Okay. Thank you, Mr. Thompson. Mr. Zadler, anything more on the cross-appeal? Sorry, Your Honor? Anything more on the cross-appeal? No, Your Honor. Okay. All right. Thank both counsel. The case is submitted.